UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAL HACKLETON,<br><br>                              Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>                              Defendant. | Case No.: 19-CV-02242-WVG<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>**[Doc. Nos. 19, 21.]** |

This is an action for judicial review of a decision by the Commissioner of Social Security, Andrew Saul, ("Commissioner" or "Defendant") denying Cal Hackleton ("Plaintiff") supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act") and Social Security Disability Insurance under Title II of the Act. The parties have filed cross-motions for summary judgment. For the reasons stated below, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

/ / /

/ / /

/ / /

## I.   LEGAL STANDARD

Pursuant to the Social Security Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Act authorizes the SSA to determine who is entitled to benefits and to establish and implement an administrative appeals process for unsuccessful claimants. *Id.* § 423 *et seq.* Defendant, as Acting Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

### A.   The SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits under the Act. 20 C.F.R. §§ 416.920, 404.1520. To qualify for such benefits, a claimant must establish (1) s/he suffers from a medically-determinable impairment[1] which can be expected to result in death or has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work s/he previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

A claimant must meet both requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving s/he "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge ("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds a claimant is disabled or not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

---

[1] A medically-determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to establish whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments which the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* § 404.1520(d).

Before proceeding to step four, the ALJ must also ascertain the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must consider relevant evidence as well as the claimant's impairments, including those categorized as non-severe. *Id.* § 404.1545(a)(3), (e). If an ALJ does not

conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the ALJ's evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant can perform the requirements of his or her past relevant work. *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). Conversely, if the claimant either cannot perform or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do any other work considering his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant can do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work the claimant can perform—allowing for his or her RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

**B.    SSA Hearings and Appeals Process**

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) a hearing before an ALJ, and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has 60 days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request review, the decision becomes the SSA's binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits. The processing begins when a claimant completes both an application and an adult disability report and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either decide the matter or refer it to another ALJ. *Id.* § 404.983.

## II.   BACKGROUND

### A.   Procedural History

On February 9, 2016, Plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. (Administrative Record ("AR") 224-30.) In both applications, Plaintiff alleged his disability began on November 30, 2015. *Id.* On May 10, 2016 the SSA denied these initial claims. (AR 70-98.) The SSA also denied Plaintiff's claims upon reconsideration on August 30, 2016. (AR 99-126.) Plaintiff then requested a hearing before an ALJ, which occurred on August 15, 2018. (AR 31-69.) The ALJ, Kevin W. Messer, issued an unfavorable decision on October 19, 2018. (AR 10-25.) Plaintiff requested the Appeals Council to review the ALJ's decision on December 18, 2018. (AR 219-23.) The Appeals Council denied Plaintiff's request for review on September 26, 2019. (AR 1-3.) Plaintiff filed this appeal on May 4, 2020.

///

**B.     Medical Overview**

Plaintiff is a male veteran who suffers from Celiac Disease.  (AR 100, 259, 355, 672.)  Plaintiff also suffers from a fractured right knee and a fractured right wrist.  (AR 100.)  Plaintiff also alleges he experiences diminished energy and mood. *Id*.  Additionally, Plaintiff suffers from Osteoporotic and Chronic Obstructive Pulmonary Disease. *Id*. Plaintiff has also been diagnosed with substance addiction.  (AR 814.)  Plaintiff has a history of using tobacco and cannabis.  (AR 502, 814.)

**1. Treatment from Veterans Village of San Diego between August 2014 and March 2016**

Plaintiff's treatment notes from the Veterans Village of San Diego show that Plaintiff initially had trouble with anxiety and depression; however, those negative feelings subsided as Plaintiff's situation in life improved.

Plaintiff's initial therapy session was on September 10, 2014.  (AR 659.)  Plaintiff's record indicates that, in 2014, Plaintiff was in therapy to relieve depression.  (AR 654.) Plaintiff often discussed his "bad mood." (AR 646, 647.)  On November 24, 2014, Plaintiff indicated he was experiencing sadness and grief.  (AR 643.)  Plaintiff also often mentioned that his health was causing him concerns.  (AR 640, 634.)

Plaintiff's mental health saw improvements in early 2015.  On January 26, 2015, Plaintiff claimed things were "pretty good," and he was "getting more medical appointments done." (AR 629.)  On February 18, 2015, Plaintiff told his therapist that after discovering that he has a gluten allergy, he felt "joy and relief to realize what was affecting him physically." (AR 626.)

In March 2015, Plaintiff's treatment notes show that he largely focused on his childhood and past relationships.  (AR 621, 622, 623.)  In April, Plaintiff continued to discuss his health and feelings about his past.  (AR 616, 617, 618.)  On June 15, 2015, Plaintiff once again asserted he was "feeling [a lot] better since they found out what [was] wrong with [him]." (AR 483, 606.)  On June 22, 2015, Plaintiff reported that his situational depression was gone. (AR 481, 604.)  Plaintiff's record from July and early August 2015

shows that he was doing well generally. (AR 596, 600, 602, 603.)  However, on August 24, 2015, Plaintiff reported feeling anxious about an upcoming driving test. (AR 472, 595.) Plaintiff missed several appointments in September 2015. (AR 468-66, 589-91.)  However, on September 14, 2015, Plaintiff "admit[ted] to intermittent situational depression and says he feels [okay] most of the time." (AR 469.)  Plaintiff continued to explore his emotions in October and November 2015. (AR 583-87.)

Plaintiff's mood was "bright," and he appeared happy on December 4, 2015. (AR 459, 582.)  Plaintiff felt "pretty good" on December 18, 2015. (AR 458, 581.)  On January 4, 2016, Plaintiff's mood was "pleasant." (AR 580.)  However, he noted that he was stressed out "[a]bout [Veterans Affairs Supportive Housing], waiting for an apartment, and waiting to hear from the hospital about a job." *Id*.  Nevertheless, Plaintiff denied depression. *Id*.

On February 4, 2016, Plaintiff once again expressed feeling anxious about waiting to hear back about his application for an apartment. (AR 456, 579.)  He denied having suicidal or homicidal thoughts at this time. *Id*.  On February 22, 2016, Plaintiff's mood was described as "calm, talkative, and engaging." (AR 578.)  Plaintiff's treatments note on March 9, 2016 indicated he "graduated from [the Veterans Village of San Diego] and moved into his own place." (AR 577.)  The note also stated that Plaintiff's "response to [the] treatment was excellent." *Id*.

### 2. Treatment from the Department of Veterans Affairs between January 2016 and May 2018

Plaintiff's medical record from the Department of Veterans Affairs largely indicates Plaintiff has no significant mental health concerns, except for a few notable instances summarized below.  Plaintiff was often described as having "appropriate interaction with other workshop members and staff." (AR 396, 405-16, 886-941.)

On February 8, 2016, Plaintiff's medical notes indicate that "he started with the [Wellness and Vocational Enrichment] Program [on] May 2015 and had to pause briefly due to physical illness.  [He] returned [and] continued with [the] program and obtained

work again[;] he became ill from working too many hours and quit his job to re-engage with work therapy." (AR 892.)  The note further indicates that Plaintiff's "challenges to gainful employment is primarily his ability to maintain his stamina and energy during the workday without comprising his health." *Id*.  Plaintiff was repeatedly classified as having no indication of suicidal or homicidal ideation.  (AR 411, 890, 891.)  On February 22, 2016, Plaintiff did not attend the Work Intervention Group meeting because "he was not feeling well and excused himself to go home;" however, there were "no safety concerns noted." (AR 886-87).  On February 29, 2016, Plaintiff's medical record notes that Plaintiff has the following diagnoses: employment problem, stressful work schedule, cannabis dependence in remission, and cannabis dependence with intoxication. (AR 885.)

In March 2016, Plaintiff's progress notes indicate that he has problems related to employment; however, there was otherwise no significant concerns to his mental health. (AR 866-85.)  Plaintiff continued to deny suicidal and homicidal ideation.  (AR 868, 869.) On March 2, 2016, Plaintiff had a colonoscopy procedure, which revealed that "the perianal and digital rectal examinations were normal."  (AR 424, 939.)  However, the procedure also revealed a five-millimeter polyp in the sigmoid colon; the polyp was ultimately removed.  *Id*.

On April 8, 2016, Plaintiff reported feeling anxious about his physical limitations. (AR 863-64.)  He noted that a trigger for his anxiety was a self-expectation to work above and beyond his physical capacity.  *Id*.  Plaintiff once again denied suicidal and homicidal ideation.  *Id*.  On April 21, 2016, Plaintiff noted he felt anxiety about his upcoming medical exam because he was worried that he has not put down all the medical diagnoses for which he was being treated.  (AR 861.)

On May 23, 2016, Plaintiff reported feeling "angry about his Celiac Disease."  (AR 858-59.)  Plaintiff claimed he has "diligently changed his dietary lifestyle by learning about what foods he can and cannot eat."  *Id*.  Plaintiff stated he has been finding support through his friends at the Marijuana's Anonymous group and denied suicidal ideation.  *Id*.

On June 2, 2016, Plaintiff reported that he feels no pain in his right knee but experiences stiffness if he sat for a while. (AR 853.) Plaintiff also claimed that he felt tired and his "mood could be better." *Id*. On June 27, 2016, Plaintiff represented he has been "dealing with his symptoms of anxiety through support system" and continued to deny suicidal or homicidal ideation. (AR 842-43.) Plaintiff also stated he was continuing to learn about his Celiac Disease and the food that he can and cannot tolerate. *Id*.

On November 1, 2016, Patient represented he could walk a quarter of a mile each day before he gets fatigued. (AR 815.) On November 3, 2016, Plaintiff's mood was euthymic, but he expressed he has started to experience "feelings and emotions differently" since he stopped smoking. (AR 810.) Plaintiff represented he has been meeting with a therapist from the Veterans Village of San Diego twice a month, but that the therapy was terminating soon. (AR 811.) Plaintiff believed he would benefit from "continuing to develop healthy coping skills and health[y] communication, particularly with 'women.'" *Id*.

On December 14, 2016, Plaintiff reported struggling with "feelings." (AR 801.) In the same note, Plaintiff also stated "his mood is largely euthymic, and he has less anger than before." (AR 800-01.) However, Plaintiff also claimed he still struggled with anxiety and gets overwhelmed over little things. *Id*. The treating physician diagnosed Plaintiff with unspecified anxiety. (AR 804.) However, Plaintiff declined the offer of medications. *Id*.

Plaintiff's progress notes indicated he had some issues between January 2017 and March 2017. On January 31, 2017, Plaintiff represented he has been feeling a "low level of anxiety and dull sense of purpose." (AR 792-93.) On February 03, 2017, Plaintiff reported his chronic fatigue has been worse for the past few months. (AR 785-86.) Plaintiff represented "he felt that [the] fatigue symptoms were improving overall but has felt 'more tired' overall since August 2016." *Id*. Plaintiff believed his fatigue may be related to his Celiac Disease. *Id*. On February 10, 2017, Plaintiff attended the first session of the Acceptance and Commitment Therapy ("ACT") for Depression. (AR 778.) Plaintiff was

diagnosed with depression and anxiety. *Id*. On March 7, 2017, Plaintiff reported he has terminated therapy at the Veterans Village of San Diego, but that he was attending weekly mental health therapy appointments. (AR 770-71.) The note states Plaintiff's mood was euthymic. (AR 771.)

Plaintiff's progress notes indicate improvements beginning in April 2017. A psychiatric note on April 7, 2017 states Plaintiff "has been feeling less anxious overall and that his therapy appointments have helped him increase his overall well-being." (AR 763-64.) On April 14, 2017, Plaintiff also "reported feeling less anxious overall and more prepared to utilized skills to decrease anxiety." (AR 762.) He also represented he was "increasingly able to monitor his thoughts and restructure them with more realistic cognitions." *Id*. Additionally, Plaintiff reported noticing positive changes in his interpersonal relationships. *Id*. On April 25, 2017, Plaintiff said he was still experiencing anxiety but felt he has had improvement in managing his symptoms. (AR 758-59.) Plaintiff reported similar feelings on June 13, 2017; August 1, 2017; August 29, 2017; and October 3, 2017. (AR 748-49; AR 745-46; AR 740-41; AR 732-33.) On November 7, 2017, Plaintiff noted he was happy and stated, "I can't complain about my life, it's really good." (AR 729-30.) Plaintiff also represented he has been managing his Celiac Disease without problems. *Id*. On December 12, 2017, Plaintiff stated he has been "irritable, 'grumpy,' and tired;" however, he was jovial during the meeting and did not show signs of depression. (AR 726-28.) On December 27, 2017, Plaintiff reported he felt stressed but was "doing okay." (AR 724.)

On January 9, 2018, Plaintiff stated, "things are going good," and he was happy. (AR 721.) On February 20, 2018, Plaintiff reported he was "worked-up" over paperwork; however, he generally felt that the process "is not as bad as he perceived it to be" after he gets through the paperwork. (AR 716-17.)

A PHQ-9 screen on March 20, 2018 revealed Plaintiff did not have depression. (AR 712.) Specifically, although Plaintiff also complained of "feeling tired or having little energy," the overall score of the screen was 3. *Id*. This score indicated a lack of depression.

*Id*. The same report indicates a PHQ-2 screen test was also performed and showed Plaintiff was negative for depression.  *Id*.  Plaintiff was also assessed for suicidal ideation on this date but denied being suicidal.  AR 710.  Plaintiff also indicated his overall health was "fine." *Id*.  On April 3, 2018, Plaintiff reported "everything's doing good."  (AR 709.)

### 3. State Agency Medical Consultant Report

In a medical report at the initial level, a state agency examiner, Dr. J. McWilliams, noted Plaintiff has the following impairments: osteoporosis, other disorders of gastrointestinal system, alcohol and substance addiction disorders, and affective disorders. (AR 77.)  The examiner wrote that only the osteoporosis and the alcohol and substance addiction disorders were severe.  *Id*.  It was also noted that Plaintiff's allegations of diminished mood and concentration is not supported by the Mental Status Evaluation ("MSE").  (AR 78, 91.)  Upon reconsideration, Dr. Marsha McFarland, another doctor who examined Plaintiff, determined the evidence does not alter the findings of the previous determination.  (AR 105.)  Hence, Plaintiff was considered as "not disabled" for both his Disability Insurance and Disability Insurance Benefits claims at the initial and reconsideration levels.  (AR 82, 95, 110, 123.)

### 4. Disability Report Appeal Form

In addition to the above record, Plaintiff claimed in his Disability Report Appeal Form that he "has begun isolating himself [from] others and spends a lot of his time isolated from his family and loved ones."  (AR 333.)  It was also noted "his physical state [was] deteriorating due to his extreme weight loss, and his depression and anxiety have increased markedly since he [was] unable to provide for himself."  (AR 334.)

### 5. Function Report, April 3, 2016

Plaintiff stated in a Function Report that his energy and stamina limited his work hours and activities.  (AR 314.)   In the same report, Plaintiff also indicated he went outside daily and was able to perform household chores such as laundry and cleaning.  (AR 315.) However, Plaintiff's limited energy and stamina affects his ability to go out. (AR 318.)  At the same time, Plaintiff also indicated that he enjoys reading, watching television, writing,

talking on the phone, and meeting people.  *Id*.  Plaintiff also attends meetings, plays, museums, and concerts.  *Id*.

### C.   **Plaintiff's Testimony**

Plaintiff testified at the hearing that he is still able to drive.  (AR 37.)  Despite his wrist pain, Plaintiff testified he is still able to take care of himself.  (AR 38.)  At the time of the trial, Plaintiff worked as a mail clerk for about five to ten hours per week.  (AR 39.)  From around September 2015 to December 2015, Plaintiff worked as a driver and valet.  (AR 40-41).  Before that, Plaintiff worked as a cab driver from 2013 to 2014.  (AR 41.)

Plaintiff testified that while he was working as a valet, he was having problems with his knee.  (AR 43.)  He said he had to use his hands to pull his legs into the car.  *Id*.  Plaintiff broke his kneecap during an altercation with a roommate in 2014.  (AR 44.)  His injury was originally diagnosed as a sprain; however, he later found out that it was an unhealed fracture.  *Id*.  Plaintiff testified he was still experiencing discomfort from his knee.  *Id*.  According to Plaintiff, his knee injury occurred when he was still working as a taxi driver.  (AR 45.)  He lost his job as a taxi driver because he started smoking marijuana again to help with the pain.  *Id*.  According to Plaintiff, he still has trouble walking because of his knee.  (AR 48.)  Plaintiff has good and bad days, depending on how active he is.  *Id*.

Due to Plaintiff's right wrist problem, he has limited capacity to lift objects.  (AR 49).  Because Plaintiff never knows when his wrist would give him trouble, Plaintiff reports he is always cautious of what he picks up.  (AR 48-49.)

Plaintiff also has a chronic obstructive lung disease.  (AR 50.)  As a result, Plaintiff experiences shortness of breath.  (AR 50-51.)  Plaintiff testified that before getting the inhaler, he would experience shortness of breath from just having conversations.  (AR 51.)  However, the inhaler has helped him out substantially.  *Id*.  But Plaintiff still experiences shortness of breath when he is engaging in physical activities.  *Id*.

Plaintiff was diagnosed with Celiac Disease in 2015.  (AR 46.)  He suffered from malabsorption, which caused his weight to decrease to 130 pounds.  *Id*.  Plaintiff was treated for his disease and was advised to stop eating gluten.  (AR 47.)  Plaintiff testified

he also had some mental health issues that were related to his Celiac Disease. (AR 53.) Plaintiff's mental health problem has improved; however, Plaintiff still attends Marijuana Anonymous and Narcotics Anonymous therapy meetings. *Id.* The number of times Plaintiff attends those therapy sessions depends on his stress level. *Id.* Plaintiff was not on any prescribed medication for his mental health at the time of the August 15, 2018 ALJ hearing. (AR 54.) He also testified that his mood was great. (AR 54.)

When asked about his day-to-day activities, Plaintiff testified he is "pretty active," and he makes sure to get out of the apartment daily. (AR 55.) Plaintiff is still able to go outside to run errands. (AR 56.)

When questioned by his attorney, Plaintiff testified that even after he stopped eating gluten, his health is not the same as it used to be. (AR 57.) Plaintiff alleged he tires easily. *Id.* Because of his Celiac Disease, Plaintiff went back to smoking marijuana, which in turn causes him to have depression. (AR 59.) Plaintiff is also mentally affected whenever he consumes traces of gluten because he becomes fatigued and spaced out. (AR 60.) Whenever Plaintiff feels that he is not concentrating very well, he usually takes a nap. *Id.*

At the hearing, vocational expert Nelly Katsell testified a hypothetical person with similar limitations to Plaintiff could perform his previous job as a cafeteria attendant. (AR 65.) Besides that, someone with Plaintiff's conditions would also be able to be a garment folder, a counter clerk photo finish, and an airline security representative. (AR 65-66.)

**D.    ALJ's Findings**

In his October 19, 2018 decision, the ALJ determined Plaintiff is not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.

The ALJ ruled Plaintiff meets the insured status requirements of the SSA through December 31, 2017. (AR 15.) At the first step of the sequential analysis, the ALJ found Plaintiff has not engaged in substantial gainful activity since the alleged onset date of the disability. *Id.* At the second step of the analysis, the ALJ found Plaintiff has the following severe impairments: osteoporosis, osteopenia, celiac disease, status post lateral condylar fracture of right knee, and status post right wrist fracture. (AR 16.) However, the following

1   impairments were considered non-severe: callosities on bilateral feet, obstructive sleep
2   apnea, chronic obstructive lung disease, chronic liver disease, irritable bowel syndrome,
3   and history of alcohol abuse. (AR 16.) Plaintiff also suffers from depression and anxiety,
4   which "do not cause more than minimal limitation to the claimant's ability to perform basic
5   mental work." *Id*. In arriving at this finding, the ALJ considered the impairments
6   individually and in combination with each other. *Id*.

7        The ALJ applied and considered the four factors set out in the Listing of Impairments
8   and found Plaintiff's mental impairments were minimally limited. *Id*. When applying the
9   four function factors under the regulations, the ALJ came to the conclusion that Plaintiff
10  had no limitation in interacting with others. *Id*. The ALJ found Plaintiff had mild
11  limitations in the remaining three functioning areas. First, Plaintiff has limitation in
12  understanding, remembering, or applying information. *Id*. Although Plaintiff is able to
13  follow both written and spoken instructions, his ability to pay attention is limited due to
14  fatigue. *Id*. Second, Plaintiff has a mild limitation in concentrating, persisting, or
15  maintaining pace. *Id*. Specifically, Plaintiff "has difficulty concentrating when he is tired.
16  However, he is able to perform simple chores; follow simple instructions; and use public
17  transportation." *Id*. Third and finally, Plaintiff has mild limitations in adapting or
18  managing oneself. Here, Plaintiff "is able to regulate his emotions in various settings. He
19  is able perform simple chores; interact with others; leave his home; handle his finances;
20  and shop for personal items." *Id*. Based on these findings, the ALJ concluded, "[b]ecause
21  the claimant's medically determinable mental impairments cause no more than 'mild'
22  limitation in any of the functional areas, they are nonsevere." *Id*. Hence, Plaintiff "does
23  not have an impairment or combination of impairments that meets or medically equals the
24  severity of one of the listed impairments." (AR 17.)

25       Next, the ALJ found Plaintiff has residual functional capacity to perform light work
26  as defined in sections 20 CFR 404.1567(b) and 416.967(b). *Id*. Here, the ALJ determined
27  Plaintiff "is limited to occasional climbing of ramps/stairs . . . [and] can occasionally
28  balance, stoop, kneel, crouch and crawl." *Id*. Plaintiff must also "avoid concentrated

exposure to extreme cold, extreme heat, vibrations, and hazards such as operation control of moving machinery and unprotected heights." *Id*.

The ALJ found Plaintiff can perform past relevant work as a cafeteria attendant. (AR 20.) The ALJ arrived at this finding because Plaintiff "(1) performed the position within the last fifteen years . . . (2) performed the position for a sufficient length of time to learn how to do the job and reach an average performance level . . . and (3) performed the position for earnings at a level that constitutes substantial gainful activity." *Id*. Finally, the ALJ found Plaintiff "has not been under a disability as defined in the Social Security Act, from November 30, 2015, through the date of this decision." (AR 21.)

## III.   STANDARD OF REVIEW

A district court will not disturb the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996)[2] (citing *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989)). Substantial evidence means more than a scintilla, but less than a preponderance. *Id*. Substantial evidence is that which a reasonable mind would consider enough to support a conclusion. *Id*. The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence is subject to more than one rational interpretation, the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.   DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on the grounds that the ALJ's finding lacks the support of substantial evidence. In particular, Plaintiff contends the ALJ's reasons for finding a non-severe impairment were insufficient. (Doc. No. 19-1, 5:13-14.) The Court addresses Plaintiff's arguments below.

///

///

---

[2] *Smolen* has been superseded on other grounds by 20 C.F.R. §§ 416.929, 404.1529(c)(3).

**A.** **The ALJ Adequately Provided a Basis for His Finding of a Non-Severe Impairment.**

Plaintiff contends the ALJ failed to provide an adequate explanation for determining that Plaintiff's activities showed that he was capable of working. (Doc. No. 19-1, 5:25-26, 6:1.) Defendant contends the ALJ complied with the regulations and adequately provided a basis for his findings. (Doc. No. 21, 3:7-9, 15-16.)

The disability regulations for evaluating mental disorders require the ALJ to consider four broad areas of mental functions. 20 CFR, Part 404, Subpart P, Appendix 1. These areas include:

(1) understanding, remembering, or applying information;

(2) interacting with others;

(3) concentrating, persisting, or maintaining pace; and

(4) adapting or managing oneself.

An ALJ will generally find the impairment to be non-severe if the degree of limitation for any of these areas is "none" or "mild." § 404.1520a(d)(1). An ALJ is required to "include a specific finding as to the degree of limitation in each of the functional areas." § 404.1520a(e)(4). However, an ALJ is not required to "document the considerations underlying the findings" in the four broad areas. *Hoopai v. Astrue*, 499 F.3d 1071, 1078 (9th Cir. 2007).

Here, the ALJ properly supported each of his determinations in the four functional areas set out by the regulations. The ALJ stated:

(1) The first functional area is understanding, remembering, or applying information. In this area, the claimant has a mild limitation. The claimant revealed that he is able to follow both written and spoken instructions. However, he wrote that his ability to pay attention is limited due to fatigue (EX. 5E).

(2) The next function area is interacting with others. In this area, the claimant has no limitation. The claimant did not indicate[] that he has difficulty

getting along with others.  He wrote that he enjoys going to meetings, plays, museums, and concerts. The claimant does not require someone to accompany him outside of his home (EX. 5E).

(3) The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation.  The claimant wrote that he has difficulty concentrating when he is tired.  However, he is able to perform simple chores; follow simple instructions; and use public transportation (EX. 5E).

(4) The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation.  The claimant is able to regulate his emotions in various settings.  He is able to perform simple chores; interact with others; leave his home; handle his finances; and shop for personal items.

(AR 16.)

Plaintiff argues the ALJ failed to explain how Plaintiff's ability to engage in certain activities means that Plaintiff is able to perform unskilled work.  (Doc. No. 19-1, 6:22-24.) However, here, the ALJ clearly stated a reason for his determination in each of the functional areas.  Specifically, the ALJ reasoned Plaintiff had a mild limitation in the first functional area because "[he] revealed that he is able to follow both written and spoken instructions." AR 16.  The ALJ also acknowledged "[Plaintiff's] ability to pay attention is limited due to fatigue."  *Id*.  The ALJ explained Plaintiff has no limitation in the second functional area because "[h]e wrote that he enjoys going to meetings, plays, museums, and concerts." *Id*. Next, the ALJ found Plaintiff has a mild limitation in the third functional area because "[Plaintiff] wrote that he has difficulty when he is tired.  However, he is able to perform simple chores; follow simple instructions; and use public transportation." *Id*. Further, the ALJ reasoned Plaintiff has a mild limitation in the fourth functional area because "[he] is able to regulate his emotions in various settings.  *Id*.  The ALJ added, "Plaintiff is able to perform simple chores; interact with others; leave his home; handle his

finances; and shop for personal items." *Id*. Hence, the ALJ sufficiently explained his reasons for finding a non-severe impairment. Furthermore, an ALJ's finding as to the four functional areas is sufficient "even without a finding 'based on all of the enumerated functional limitations.'" *Keyser v. Comm'r SSA*, 648 F.3d 721, 726 (9th Cir. 2011) (citing *Hoopai*, 499 F.3d at 1077.) Requiring the ALJ to do more than what he has already done would be contrary to precedent. *See id*.

Additionally, contrary to Plaintiff's assertion, the ALJ explained why he determined Plaintiff is able to perform light unskilled work. After determining that "[t]he severity of the claimant's physical impairments, considered singly and in combination, does not meet or medically equal the criteria of any impairment listing or Social Security Ruling," the ALJ then found that Plaintiff "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)." (AR 17.) The ALJ made this finding after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*. The ALJ reasoned, "[regarding Plaintiff's] activities of daily living, [Plaintiff] admitted to working at the hospital; cooking simple meals; performing simple chores; and shopping for personal items. These reported activities of daily living are generally inconsistent with the degree of functional limitation alleged." *Id*. Finally, the ALJ concluded, "Plaintiff is limited to occasional climbing of ramps/stairs. He can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch and crawl. Further, [Plaintiff] must avoid concentrated exposure to extreme cold, extreme heat, vibrations, and hazards such as operational control of moving machinery and unprotected heights." *Id*.

After determining Plaintiff has the residual capacity to perform light work, the ALJ specifically found that Plaintiff "is capable of performing past relevant work as a cafeteria attendant." (AR 20.) The ALJ reasoned Plaintiff is unable to perform his past jobs as a cab driver, driver, and parking lot attendant based on the vocational expert's testimony. *Id*. Thus, the ALJ concluded, "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is

able to perform it as actually and generally performed.  The vocational expert's testimony is consistent with SSR 00-4p, as the positions of 'cafeteria attendant' do not require the performance of any activities precluded by claimant's residual functional capacity." *Id*. Accordingly, the ALJ sufficiently explained his reason for finding a non-severe impairment and for determining that Plaintiff's daily activities show that he is capable of performing light work as a cafeteria attendant.

**B.     The ALJ's Finding of a Non-Severe Impairment Is Supported by Substantial Evidence.**

Plaintiff contends the ALJ erred in singling out a few isolated instances of improvement and treating them as a basis for his finding.  (Doc. No. 19-1, 7:18-22.)  In addition, Plaintiff claims the record indicates his inability to engage in competitive employment due to situational depression and mental setbacks.  *Id*.

Contrary to Plaintiff's assertion, the ALJ did not rely on "a few isolated instances of improvement" when arriving at his decision.  (Doc. No. 19-1, 7:23-26.)  Although engaging in minimal routine activities does not automatically translate to the ability to consistently work, *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989), a plaintiff's substantial activities support a finding that the impairments are non-severe.  *Castillo v. Berryhill*, 693 F. App'x 659, 660 (9th Cir. 2017) (unpublished).  Here, Plaintiff reported going out daily. (AR 317.) Plaintiff stated that he goes shopping every day for thirty minutes each time.  *Id*.  Although Plaintiff noted that his limited energy and stamina affects his ability to go out, he wrote that he attends plays, baseball games, and the grocery stores on a regular basis.  (AR 318.) Additionally, Plaintiff represented he does not need anyone to accompany him at these events.  *Id*.  Plaintiff's considerable level of activities cannot be described as something that only occur occasionally.

Plaintiff asserts the record supports his allegations of decreased energy and stamina brought on by his depression and anxiety.  (Doc. No. 19-1, 7:3-4.)  However, although the record does indicate instances where Plaintiff was suffering from depression and anxiety, the broader picture appears to show Plaintiff's mental health has improved.  Additionally,

the mere existence of mental impairment does not automatically mean that Plaintiff suffers from a severe impairment. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (noting that "the mere existence of an impairment is insufficient proof of a disability.")  Plaintiff supports his claim by noting that on March 20, 2018, he was assessed for suicidal ideation. (Doc. No. 19-1, 7:6-8.)  However, Plaintiff failed to state that the assessment showed that he was negative for suicidal ideation.  (AR 710.)  In fact, Plaintiff was often assessed for suicidal ideation; however, the record indicates that the results were negative.  (AR 674, 707, 710.)  Hence, the record indicates that Plaintiff's mental health has largely been stable.

Plaintiff's own testimony supports the ALJ's finding of non-severity.  Although Plaintiff noted at the hearing that he was "a little stressed out," Plaintiff stated that he was not taking any medications for his mental health.  (AR 53-54.)  He also testified that his mood was great, and that people have often told him that he is "too optimistic."  (AR 54.)  Plaintiff also testified that he is "pretty active."  (AR 55.)  Plaintiff represented he made sure to get out of the apartment every day.  *Id*.  Therefore, Plaintiff's own testimony contradicts his assertion that the "record portrays an afflicted individual with limited functional ability, merely making the best of unstable situation." (Doc. No. 19-1, 8:7-10)

Plaintiff's medical record largely shows Plaintiff's mental health has been improving.  Plaintiff alleges in his motion for summary judgment he suffers from "severe PTSD (fear and flashbacks), extreme anxiety (including an ability to leave his house alone even for necessities such as food, and loss of work due to being around strangers), irrational fears/paranoia (someone is watching him, someone always knows information about him including his whereabouts and phone number), inability to maintain relationships with others, and inability to handle stress (experiences convulsions, cannot think, and breaks down)." (Doc. No. 19-1, 8:1-7.)  However, it is unclear which medical note Plaintiff based these assertions on as the pages Plaintiff cites do not indicate those conditions.  The Court has exhaustively reviewed the administrative record in this litigation, and it has found no

evidence supporting Plaintiff's claims to this end.[3]

Although the record does show that Plaintiff had some trouble with his familial relationships, most of these problems occurred before his alleged disability onset date of November 30, 2015. (AR 583, 606.) Additionally, although the record shows that Plaintiff occasionally struggled with his emotions, Plaintiff's medical record indicate that beginning of April 07, 2017, Plaintiff has been "feeling less anxious overall." (AR 763, 793, 801, 810.) Moreover, the record shows that Plaintiff's mood during medical sessions was often "euthymic." (AR 707-885.) Hence, the Court finds that there is substantial evidence to support the ALJ's determination that Plaintiff's mental impairments are non-severe.

## C.   Plaintiff Is Not Entitled to Summary Judgment.

In addition to Plaintiff's summary judgment motion, Defendant's cross-motion for summary judgment is pending before the Court. Defendant contends the ALJ's finding of a non-severe impairment is supported by substantial evidence.[4] As discussed above, the ALJ properly applied the special technique for evaluating mental impairments and the record supports the ALJ's finding of non-severity. For these reasons, this Court DENIES Plaintiff's MSJ and GRANTS Defendant's Cross-MSJ.

## V.   CONCLUSION

Based on the foregoing, Plaintiff's MSJ is DENIED and Defendant's Cross-MSJ is GRANTED. The Clerk of Court is instructed to enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

DATED: March 22, 2021

_____
Hon. William V. Gallo
United States Magistrate Judge

---

[3] Plaintiff has lost credibility with the Court for citing incorrectly to the record.

[4] Defendant also contends that even if the ALJ erred in finding a non-severe impairment, the error was harmless. Having found that the ALJ did not err in his finding, this Court finds no need to address this portion of Defendant's argument.